## Pearl Packing Co. v. Ransdell.

Feb. 18, 1941.

John M. Berry and J. Wirt Turner for appellant.

Kinsolving & Reasor and Eugene Mosley, Jr., for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellee, plaintiff below, brought this action in the Trimble circuit court against appellant, a corporation, defendant below, to recover damages for breach of an oral contract, the terms of which, according to the contentions of the respective parties, are set out in the pleadings.

Plaintiff alleged that on the 7th day of February, 1938, he entered into a contract with defendant by which defendant agreed to sell and deliver to plaintiff at its place of business in Trimble County, Kentucky, five hundred country cured hams that would be in condition to be immediately smoked and would then be in a condition to be sold to the general public as "country cured" hams for which plaintiff agreed to pay and did pay the price of $1,630.32. Plaintiff further stated that defendant further agreed that the hams would be "country cured" by the defendant according to the best practices and usage known to the packing industry and to people in general who are in the business of country curing hams, and that defendant further represented to the plaintiff that it had experts to country cure the hams and was well versed in the practices and usage of country curing hams, and after they had been country cured

by defendant they would be good and marketable to the general public; that he accepted the terms and conditions of the agreement with defendant and paid the price therefor.

Plaintiff further stated that on or about the 11th day of February and the 15th day of February, 1938, the hams were delivered to him at his place of business in Trimble County, Kentucky, by the defendant, and plaintiff sold several of the hams to the general public and he later discovered that the hams he sold and the ones he still has in his possession were not in a marketable condition for sale and that they were negligently and improperly cured by the defendant in violation of the contract and agreement.

Plaintiff further alleged that by reason of the improper curing of the hams and by the violation of the contract, all the hams were spoiled and condemned by the State Board of Health of the State of Kentucky and were a total loss to the plaintiff, and by reason thereof he had been damaged in that account in the sum of $1,458.63.

It appears that plaintiff sold a few of the hams, which accounts for the reduction of his alleged damages from the purchase price of the hams to the sum prayed for stated above. Further allegations were made with reference to the cost of the hams and the price which plaintiff could or might have sold them and he asked to recover the further sum of $1,146.42 as anticipated profits. However, the court struck from the petition all the allegations relating to anticipated profits and that item is not involved in this appeal.

Defendant filed its answer traversing the allegations of the petition, and after certain other motions and steps were taken, not necessary to discuss herein, defendant filed its amended answer pleading in substance that at the time of entering into the alleged contract with plaintiff it was engaged in the meat packing industry in the city of Madison, Indiana, and that by the laws of the United States in force at that time, the defendant was not permitted to ''country cure'' hams and likewise plaintiff was not permitted to sell hams purchased from defendant as ''country cured'' hams and for that reason the contract alleged by the plaintiff was illegal and void.

By paragraph two of the amended answer, defendant admitted that it sold to the plaintiff five hundred hams at an agreed price of 15½ cents per pound, but alleged that they were to be paid for by the plaintiff at the defendant's place of business as the hams were produced and at which time they were to become the property of the plaintiff; and by separate contract defendant agreed to cure the hams for the price of 1½ cents per pound in the same manner it cured hams which it sold to the general public, with the understanding and agreement that any loss by reason of weight or by reason of faulty curing should be borne by the plaintiff; that plaintiff paid for the hams as they were produced and cured in the same manner as it cured hams which it sold to the general public, and that the hams were accepted by plaintiff at defendant's place of business and after plaintiff had tested and accepted them, they were in good marketable condition and cured according to the contract, and that if the hams proved to be unsound or spoiled same was caused by the negligent handling of them by the plaintiff after they became his property.

Upon motion of the plaintiff the court struck the first paragraph of defendant's answer (pleading that the contract between the parties was void) with leave to defendant to amend, whereupon defendant filed its second amended answer in which it, in substance, reiterated, but more elaborately and definitely, the same paragraph which had been stricken, by alleging that by title seven, Section 192 of the United States Code Laws, 7 U. S. C. A. Section 192, it was provided:

"It shall be unlawful for any packer * * * to * * * Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce,"

and Section 228, Title 7, U. S. C. A. provides that:

"The Secretary may make such rules, regulations and orders as may be necessary to carry out the provisions of this chapter."

It was further alleged that the Secretary of Agriculture of the United States did, in November, 1922, adopt regulations providing that:

"Such terms as 'country,' 'farm,' and the like, shall not be used on labels in connection with meat and

products unless such meat and products are actually prepared in the country or on the farm."

The court also struck this amended answer, and defendant excepted.

We have before us a copy of the regulations promulgated by the United States Department of Agriculture referred to and quoted above, and immediately following the above quotation appears this language:

"However, if the articles are prepared in the same way as in the country or on the farm, these terms, if qualified by the word 'style' in the same size and style of lettering, may be used."

In reference to the qualification of the rule just stated, as will later be seen from our discussion of the evidence, defendant's own witnesses testified that it contracted to sell to plaintiff country "style" hams. It would appear, therefore, that such contract is permissible under the rules of the United States Department of Agriculture relied on by defendant. However, aside from that proviso of the rule and, considering the rule as a whole, we do not think it prohibited the parties from entering into the contract as alleged by plaintiff or the defendant. Defendant relies principally upon the language of the rule in reference to "deceptive practice or device in commerce." So far as the record shows, there was no deceptive devices resorted to by either of the contracting parties. Presumably the contract was made in good faith and free from "unjustly discriminatory, or deceptive practice," regardless of whether or not it was subsequently breached. It results that the court properly sustained plaintiff's motion to strike the amended answer.

By subsequent pleadings the issues were made and a jury trial resulted in a verdict and judgment for the plaintiff. The verdict consisted of various items found as damages under the evidence and the instructions given to the jury, aggregating the sum of $1,409.57.

In the motion and grounds for a new trial defendant specifies a number of alleged errors, among which is that the court erred in the instructions given to the jury. However, in brief of appellant the only grounds relied on for reversal are (1) the contract was illegal and void, and (2) the verdict of the jury is not sustained by the

evidence and is contrary to the weight of the evidence and the law. Since it is a known rule that this court will not consider matters not discussed in brief of counsel, we need not enter into a discussion of any of the alleged errors except the two mentioned above. We have already disposed of ground one, hence there is left only for our consideration the sufficiency of the evidence.

The plaintiff testified that he first contacted the defendant by calling its office over the telephone on or about the 28th day of January, 1938, and asked about the price of hams and how much it would charge for curing them and he was informed that the price of the hams would be 15½ cents per pound and 1½ cents per pound for curing them; on February 7, following that conversation, he went to defendant's place of business in Madison, Indiana, and Mr. Adcock, a representative or employee of defendant company, went with him to see Bob Yunker, vice president and general manager of defendant, and talked to him concerning the purchase of the hams. The witness was asked to relate to the jury the conversation with Mr. Yunker on that occasion, and he answered:

"Well, I went to his plant, to his office, on February 7th. I told him I had a great demand for country hams to sell to the general public and sell at my place of business, and I asked him, told him I wanted them country cured like the farmers cure them with dry salt, and his price was fifteen and a half cents per pound and one and a half cents for curing them, and said he could cure them in his own plant just like I get through the country, which I had been buying from the farmers and he was to put these hams down as he killed them and he mailed me a bill for two hundred and twenty-seven hams. I mailed him a check. * * *"

Plaintiff further said that the first shipment of the hams was delivered to him on February 26, 1938, and he was presented an invoice for that purchase. The invoice and bills filed with the record itemized the charges at 15½ cents per pound for the hams, and 1½ cents per pound for curing them. Plaintiff further testified that when negotiating for the purchase of the hams from the defendant, Mr. Yunker said:

" 'I will cure those hams and cure them like they cure them out on the farm, dry salt method and they will be just like the hams you get through the country.' "

And Mr. Yunker further said:

" 'I will put these hams down in different lots, when I get about half of the five hundred I will mail you bill to mail me check.' So the hams was put down on February 7th, February 11th and February 15th."

The words "put down" was explained to mean, in meat packing parlance, to cure. Plaintiff was asked about the condition of the hams when they were delivered to him at his place of business on the 26th of February, and he answered:

"Well, they looked like they had been washed, was soggy and watery looking. The solution, I called it blood, I couldn't say for sure whether it was blood, but a bloody solution running out of them, and I immediately went to Mr. Yunker and explained to him about that, because there had been some remarks made that if the blood was running out of them they wasn't cured."

Plaintiff said that he then went to Madison, Indiana, to talk to Mr. Yunker about the condition of the hams and, on being asked to detail that conversation to the jury, he said:

"Well, I went to Madison and went to the plant, and I don't know whether I talked to Bob Yunker or Leo Yunker, talked to one of the Yunkers, I don't recall which one it was, and I said 'The blood was running out of those hams where they was drill probed, or bloody solution' and I said 'I have had a lot of people tell me they won't keep.' He said 'You needn't worry about that,' said 'That don't mean anything, they will keep all right.' I thought he was experienced in the business. I came home and that was all that was done about it."

"Q. You relied on what he told you at that time? A. Yes, sir."

It appears that plaintiff agreed to smoke the hams himself after he had received them from defendant. It

appears, however, from the evidence of experts in the meat curing business that the smoking of hams has nothing to do with the preservation of them and that the preservation depends on the manner of curing them. Plaintiff explained the smoke house and equipment he had for smoking hams, and it appears from his testimony that he smoked them according to the well known and accepted rules of smoking hams.

Plaintiff said that when he learned that the hams were spoiled he immediately went to see Mr. Yunker, and related the pertinent part of his conversation with him, in this language:

"I said, 'Mr. Yunker, those hams, I had sold five of them, they were bad,' and he said, 'that is something funny, I never cured any like that before,' so I said, 'now, I feel like you will do the fair thing about it, the good hams I need, and the bad ones I am expecting you to take back.' He said, 'They are your loss, I am through with them.' "

"Q. Did you ask Mr. Yunker to come, or send a representative to your place of business to examine those hams? A. I did.

"Q. To see whether any of them were good, or not? A. I did. * * *

"Q. What was his answer to that request? A. Said, 'I am not interested in them, they were in your possession when they left here, I am not interested in them.' "

It is also shown in the evidence, and not denied, that the State Board of Health of Kentucky condemned the hams (except the few plaintiff had disposed of) which resulted in a total loss to the plaintiff.

Without giving a further detailed resume of plaintiff's testimony, it is sufficient to say that it tends to support the sort of contract set out in the petition.

Major Adcock, who was called as a witness for the plaintiff, testified that he went to Madison, Indiana, with plaintiff in February, 1938, and heard the conversation between plaintiff and Mr. Yunker relative to the purchase of the hams. He said:

"Well, the first suggestion was he wanted to know if he could purchase this amount of ham, five hun-

dred it was, from him, and they talked about the price for awhile. They finally decided that they would furnish him that many hams, five hundred hams, and then the suggestion came up would they cure those hams for him. He said he would cure them. Mr. Ransdell says, 'I am in the restaurant business, and says, in my place of business those hams I have been buying them all out in the country.' Said, 'Now, what I want is those hams to be trimmed and cured just like these hams I get from these farmers' and they set the price from one to two cents for curing them, and I think finally made it a cent and a half maybe."

Mr. Adcock further said that Mr. Yunker agreed to deliver the hams to plaintiff at his place of business after they were cured and that plaintiff was not to do anything except to smoke the hams after he received them.

William Fisher, testifying in behalf of plaintiff as an expert in curing hams, after qualifying by showing his experience in that business, testified that he examined the hams in the possession of plaintiff, and said:

"According to my experience it was chilled before it started to take salt; in other words, it got froze too hard or chilled in a chilling room too bad to take salt. Fresh meat that is chilled or froze it will not take salt."

"Q. Then, in your opinion that ham wouldn't take salt? A. It wouldn't take salt.

"Q. Therefore, could it have been cured? A. Why, sure not.

"Q. To what extent, or to what degree, if any, was that ham, or any part of it, cured? A. I wouldn't say there was any part cured, because it smelled from the surface to the bone, and that was due to the freezing of the outside skin and pores of the meat so salt couldn't penetrate. I could tell no part cured."

The witness further said that smoking a ham would not cause any spoliation and if it had been properly cured it cannot be injured by smoking it.

Prentice Heath also testified as an expert in the art of country curing hams, and after detailing the methods,

he said that if a ham was properly "country cured" by the dry salt method of curing, it would be dry clear through and no spoliation would result. He further said that judging from the condition the hams were in when received by plaintiff, they had not been cured. Other witnesses gave like testimony, all of which tended to prove plaintiff's contention that the hams were not "country cured" or in fact cured at all.

The plaintiff also took the deposition of Mr. Yunker in December, 1938, as if on cross-examination, about four months before the trial in the Trimble circuit court, which deposition is filed with the record and on which Mr. Yunker was cross-examined in the circuit court. In his deposition Mr. Yunker testified that his first conversation with plaintiff was in late January or the early part of February, 1938; that defendant sales manager came to him with plaintiff and it appeared that the sales manager and plaintiff had already agreed on the price of some green hams and plaintiff wanted him, Yunker, to cure the hams and he agreed to do so, but that plaintiff did not say how he wanted the hams cured. He said the price for the hams was 15½ cents plus 1½ cents for curing them. He said he told plaintiff that as a rule they did not cure hams for outsiders but plaintiff explained that he was anxious to have them, and he, Yunker, finally agreed to accommodate plaintiff and cure the hams. The witness further said that it was his agreement with plaintiff that the hams were to be delivered to him at his place of business and that it was his understanding that at the time the green hams were weighed for plaintiff they became his property and defendant was to cure the hams and deliver them at a later date. Mr. Yunker said that he had nothing to do personally with curing meat but he had had experience in that business. He was asked if he had had experience in "country curing" hams that are to be sold to the general public in the country, and he answered:

"We have had experience with country style hams."

"Q. What do you mean by country style hams? A. Well, we couldn't well produce a country ham unless we smoked it in the country."

He was asked to define what he meant by country "style" hams, and he answered:

"Well, we consider that a ham with a long shank and a country trim."

"Q. Is that cure or curing process that you used on the Ransdell hams a dry salt cure? A. Yes, sir."

He further explained that their method of curing hams was by the dry salt process and that they were put through this process at various intervals. It appears that the process used by defendant in curing hams was the same or substantially the same as the "country curing" process, which indicates that defendant actually attempted to "country cure" the hams.

Mr. Yunker was also examined in reference to the bills and invoices sent to Mr. Ransdell on which appears the letters ".C. C." He was asked why he put on the bills and invoices "country cured" and he said he didn't recall what was on the bills. He was rigidly examined as to the meaning of the letters "C. C." and, since the questions asked and the answers thereto, together with inferences that might be drawn therefrom might be of some significance, we here quote that part of his deposition:

"Q. What do the initials 'C. C.' mean? A. Special trim we give the ham and the dry cure; that is the method we use to cure.

"Q. What does 'C. C.' mean? A. That is the trim we use. Those letters indicate the type of trim and type of cure.

"Q. What does the 'C. C.' mean? A. That is what we understand it means.

"Q. What do the two letters, 'C. C.' stand for? A. It is the trim and the type of cure these hams are to have.

"Q. Why did you use 'C. C.' on this bill? A. I told you that indicates the type of trim and type of cure. That is the type of trim and type of cure the hams are to have.

"Q. Doesn't that mean 'country cured'? A. No.

"Q. It doesn't mean 'country cured'? A. No.

"Q. It means the type of cure? A. That is it.

"Q. What do you call that type of cure? A. Country style.

"Q. Why did you use 'C. C.' instead of 'C. S.'? A. Why, I don't just know our reason for it, but that is the way we designate that particular type of ham.

"Q. In other words, you say that 'C. C.' means 'country style'? A. When we mark a batch of hams with those letters we understand that they are to be trimmed a certain fashion and cured in a certain manner.

"Q. If you had marked a bill 'C. C.' and handed it to the person that is supposed to take care of those hams, as I understand it, he would understand it is supposed to be country style or country cured hams? A. Country style ham.

"Q. You would not mark it 'C. S.', but you would mark it 'C. C.'? A. Yes, sir."

However, upon the trial of the case Mr. Yunker was again asked to explain the meaning of the letters or term "C. C." which appeared on the bills and invoice, and he answered:

"Well, as in this particular case, a salesman took the order for green hams. That order goes into the office and probably be filled by a shipping clerk, and before the shipping clerk can fill the order he has to know how those hams are to be trimmed and so the instruction goes to the cutting department where they are cut and only hams, bacons and shoulders, etc., and when we mark an order 'country cut' that indicates that ham is to have a long shank and long butt, in other words, it is a different shaped ham than the regular ham that we sell to meat trade. In addition to that when that ham goes on to the curing department the curing foreman understands that ham is to go into dry salt rather than into pickle. * * *

"Q. Let me ask you another question. You said in your deposition that you knew how farmers

generally on the farm cured hams, didn't you? A. I discussed it with many farmers.

"Q. And you told the court you could have cured it in exactly the same way? A. Yes, sir.
"Q. But you didn't do it, did you? A. No, sir."

Mr. Yunker stated in the beginning of his deposition that he had been connected with and an officer of the defendant company for about twenty-five years. In view of his experience in the meat packing and meat curing business of different styles and methods, as he contends, it is passing strange that when he gave his deposition he thought the letters "C. C." meant "country style." But, when he testified in court he unhesitantly said that the letters "C. C." meant "country cut."

Francis Bilz, assistant sales manager for defendant, whom plaintiff first contacted in the negotiations for the purchase of the hams, testified that plaintiff inquired of him about the purchase of fresh hams. He further said that he was present and heard the conversation between plaintiff and Mr. Yunker, and the agreement was that defendant was to furnish plaintiff with a ham with a "long butt and long shank." The witness was asked how he referred to that sort of ham, or how he marked it as to style, and he answered: "Well, the cuts of this ham, in billing this hame is 'C. C.' That is just kind of a term of cut." He further said that those letters meant "country cut" on the bill and were to indicate to the cutting department the style and shape of the ham. Later on he further said that the term "C. C." designated a ham with longer shank and longer butt than their regular packing trade. He also said that after they had agreed on the price of the hams plaintiff asked about curing them and Mr. Yunker informed plaintiff that he was not interested in curing hams for anybody, but that at the insistence of plaintiff Mr. Yunker finally agreed to cure the hams up to the point of smoking them for the price of 1½ cents per pound.

Frank A. Botteron, testifying in behalf of defendant, stated that he had been working in different plants engaged in the meat packing business for the last thirty years and that he was familiar with the process em-

ployed by defendant company in curing hams, and that its process was equal to the best.

A number of other witnesses testified in behalf of plaintiff, but their evidence is not germane to the contract between the parties, but it may be conceded that in other respects their evidence tended to corroborate Mr. Yunker.

Plaintiff was called in rebuttal and denied that he was to take responsibility for the curing of the hams or the spoliation of same because, he said, he thought Mr. Yunker was experienced in curing meat and he relied upon his skill and judgment, and further said that there was nothing said between him and Mr. Yunker about him, plaintiff, assuming such responsibility.

Major Adcock, who was present and heard the agreement between plaintiff and Mr. Yunker, was also called in rebuttal, and he said he did not hear any agreement one way or the other as to who would assume the responsibility for the curing or spoliation of the hams.

It is at once apparent from the evidence that the hams in question were not "country cured" or cured according to the best practices and usage known to the people in curing hams, and it is indeed doubtful that they were cured at all. We have the positive evidence of plaintiff and his witness who was present and heard the agreement between the parties that the hams were to be "country" cured, or cured like they are cured on the farm, or at least actually cured in some manner. Mr. Yunker and one witness for him who heard the agreement admit that they were to cure the hams but insist that plaintiff was to assume the responsibility for spoliation. Other witnesses did not appear to know much if anything about the contract. Furthermore, once Mr. Yunker's evidence given in his deposition and again before the jury is considered as a whole, it is not at all convincing, nor indeed hardly persuasive with reference to the meaning of the letters "C. C." appearing on the invoices or bills for the hams. It appears to us that the use of these letters strongly indicates that the hams were actually billed to the plaintiff as "country cured" hams, which corroborates plaintiff's version of the contract.

It is thus seen that the evidence is indeed conflict-

ing and we are unable to say which side, if either, is favored with the preponderance thereof. But if it be conceded, however, that the verdict is contrary to the preponderance of the evidence, that alone would not mean that it is insufficient to support the verdict, since it is a well known rule that any evidence of a probative and substantial nature is sufficient to support the verdict of the jury, but a preponderance of the evidence is not required. Since the jury saw proper to find for the plaintiff, we have no authority, under the evidence, to disturb the verdict.

Wherefore, the judgment is affirmed.